IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

LAURA ANN PIDGEON,

               Plaintiff,

        v.

CAROLYN W. COLVIN, Acting
Commissioner of Social
Security,

              Defendant.

HONORABLE JEROME B. SIMANDLE

Civil No. 15-2897 (JBS)

**OPINION**

APPEARANCES:

Daniel S. Jones, Esq.
LAW OFFICES OF HARRY J. BINDER & CHARLES E. BINDER, P.C.
60 East 42nd Street, Suite 520
New York, New York 10165
    Attorney for Plaintiff

Paul J. Fishman
UNITED STATES ATTORNEY
    By:  Stuart Weiss
        Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
P.O. Box 41777
Philadelphia, Pennsylvania 19101
    Attorneys for Defendant

**SIMANDLE**, Chief Judge:

## I.   INTRODUCTION

This matter comes before the Court pursuant to 42 U.S.C. § 405(g) for review of the final decision of Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration denying Plaintiff Laura Ann Pidgeon's application for disability

insurance benefits under Title II of the Social Security Act (the "Act") and supplemental security income under Title XVI of the Act.

Plaintiff alleges that the Administrative Law Judge ("ALJ") made three errors in determining that she is not disabled under §§ 216(i), 223(d), and 1614(a)(3)(A) of the Act:  (1) the ALJ failed to properly weigh the medical evidence in determining Plaintiff's residual functional capacity ("RFC"); (2) the ALJ failed to properly evaluate Plaintiff's credibility in determining her RFC; and (3) the ALJ relied on flawed vocational expert ("VE") testimony.

For the reasons that follow, the Court will affirm the decision of the ALJ.

## II.   BACKGROUND

### A.   Procedural History

Plaintiff Laura Ann Pidgeon of Burlington, New Jersey, was 32 years old on July 9, 2010, when she filed her application for disability insurance benefits ("DIB") and her application for supplemental security income ("SSI"), alleging an onset of disability on December 9, 2009.  (R. at 47, 59.)[1]  Both

---

[1] There is some discrepancy in the record as to whether Plaintiff filed the applications on the same date, and whether the date of filing was July 9, 2010 or July 23, 2010.  The Disability Determination Transmittals indicate that the DIB application was filed on July 23, 2010 and the SSI application was filed on July

applications were denied on March 14, 2011, (R. at 47, 132–43),
as were requests for reconsideration on May 24, 2012, (R. at 47,
147–52).  A hearing was held on August 14, 2013 before ALJ
Nicholas Cerulli at which Plaintiff appeared with counsel and
testified.  (R. at 47, 68–114.)  On January 10, 2014, the ALJ
denied Plaintiff's request at step five of the sequential
analysis, finding that Plaintiff was capable of performing jobs
that existed in significant numbers in the national economy.
(R. at 59–60.)  The Appeals Council subsequently denied
Plaintiff's request for review.  (R. at 1–3.)  Plaintiff then
filed the instant appeal on April 23, 2015, and briefing was
completed on October 27, 2015.

**B.  Medical History**

The Court will recount only as much of Plaintiff's medical
history as relevant to this appeal.  The record establishes that
dating back to 2006, Plaintiff suffered from lumbar spine
impairment, and she underwent a lumbar laminectomy and
discectomy in September 2006.  (R. at 514–21.)  On the alleged
date of onset of disability, December 9, 2009, Plaintiff was

---

9, 2010.  (R. at 125–26.)  However, the actual applications in
the record appear to indicate that both application were filed
on July 23, 2010.  (R. at 195–205.)   The precise date of filing
does not affect the decision, nor does it affect Plaintiff's age
at the time of filing, so the Court will adopt the ALJ's
recitation of the procedural history on this point in the
absence of any challenge to its accuracy.

fired from her job while applying for disability through her employer. (R. at 78–79.) She has not been employed since that date. (R. at 79, 249.)

Beginning in mid-2009, Plaintiff began seeing various physicians with complaints related to her gait, joint pain, and radiating pain. (See, e.g., R. at 373–74, 403–04.) After undergoing a CT scan in December 2009, Plaintiff was diagnosed by Kennedy Ganti, M.D., of Virtua Family Physicians with back pain, depression, fibromyalgia, and autonomic dysfunction. (R. at 386–88, 489.) Around this time, Plaintiff was fired from her job. (R. at 78–79.)

On March 23, 2010, Plaintiff began seeing Stephen J. Dante, M.D., of Pennsylvania Hospital. (R. at 410.) After examination and review of her CT scan, Dr. Dante recommended pain management treatment for her symptoms. (R. at 411.) Plaintiff went to the pain management specialist, Stephen Boyajian, D.O., on April 1, 2010, who ordered an MRI which revealed abnormal soft tissue in her back. (R. at 423–26, 445–46.) Plaintiff also had a nerve conduction study done which found "no electrodiagnostic evidence" to suggest radiculopathy. (R. at 435–36.)

Plaintiff then started seeing James Sanfilippo, M.D., an orthopedic spine surgeon from the Virtua Medical Group, on May 20, 2010. (R. at 507.) Dr. Sanfilippo reviewed Plaintiff's imaging tests and assessed that she had lumbar degenerative disk

4

disease with radiculopathy.  (R. at 506.)  Dr. Sanfilippo suggested Plaintiff begin physical therapy and get an epidural steroid injection ("ESI").  (Id.)  Plaintiff received ESI treatment from Philip Tasca, M.D., another pain management doctor, in July of 2010.  (R. at 430-34.)  Plaintiff reported improvement after ESI treatment to both Dr. Tasca and Dr. Sanfilippo.  (R. at 428-29, 433, 505.)

However, by August 19, 2010, Plaintiff returned to Dr. Sanfilippo and reported no sustained improvement.  (R. at 476.) At that point, Plaintiff had a decreased range of motion, a right foot drop, and was using a cane.  (Id.)  Dr. Sanfilippo performed surgery on September 24, 2010 which consisted of a posterior L3 to S2 revision decompression and instrumented fusion for disc herniation, radiculopathy, and lower back pain. (R. at 454, 472-74.)  Plaintiff was then discharged on September 27, 2010.  (R. at 454.)  On a follow up visit in December 2010, Dr. Sanfilippo noted that Plaintiff "reports she is actually doing quite well" after surgery.  (R. at 496.)  Plaintiff still had some mild back pain, and tenderness over both hips.  (Id.)

While Plaintiff was being treated for her back pain, she continued seeing Dr. Ganti as well as Roanna Alcera, M.D., also of Virtua Family Physicians, for primary care and for care related to anxiety, stress, and panic attacks.  (See R. 478-87.) Further to her mental health concerns, Plaintiff was seen by

Lewis A. Lazarus, Ph.D., for an evaluation by the State of New Jersey pursuant to her claim for disability benefits.  (R. at 526.)  In her examination with Dr. Lazarus, Plaintiff reported "crying spells, diminished self-esteem, feelings of hopelessness, fatigue and loss of energy nearly every day, as well as feelings of worthlessness" in addition to constant pain and panic episodes.  (R. at 527.)  Dr. Lazarus assessed her affect as "depressed, apathetic, hopeless, tense, and almost brought to tears at several times," but also noted that she was coherent, goal-directed, and able to follow and understand conversation with adequate memory functioning.  (R. at 527–28.) He gave her a GAF score[2] of 51, and recommended mental health treatment and medication.  (R. at 528.)

Plaintiff saw Nithyashuba Khona, M.D., for a state evaluation for disability related to her physical complaints on February 14, 2011.  (R. at 531.)  Dr. Khona found no spinal or paraspinal tenderness, a normal gait, and no spasm or trigger points, but did note some lower back tenderness.  (R. at 532– 33.)  Dr. Khona opined that Plaintiff "may be trainable for a desk job."  (R. at 533.)  After reviewing Plaintiff's medical

---

[2] The Global Assessment of Function ("GAF") assessment is no longer used as a diagnostic tool.  (See Pl's Br. at 15 n.37.) However, it was in use at the time of Dr. Lazarus's assessment of Plaintiff.  A GAF score of 51–60 denotes moderate psychological symptoms.  (See id.)

record, another state agency physician, James Paolino, M.D., opined on March 7, 2011 that Plaintiff could stand and/or walk at least two hours in an eight-hour work day and sit about six hours in an eight-hour work day. (R. at 537-38.)

In April 2011, Plaintiff began seeing Kwang Hoon Han, M.D., a rheumatologist at Cooper University Hospital, complaining of pain. (R. at 640.) Dr. Han assessed tenderness in her hands and feet, noted that she may have seronegative rheumatoid arthritis and also diagnosed her with fibromyalgia, and prescribed Methotrexate. (R. at 641-42.) A week later, Plaintiff went to the ER at Virtua Hospital reporting back pain, and on evaluation was assessed to have some tenderness, but otherwise ambulatory with a normal gait. (R. at 622-24.) She was discharged with pain medication. (R. at 624.) In May 2011, Plaintiff followed up with Dr. Han and reported less stiffness, but side effects from Methotrexate. (R. at 637-39.) Dr. Han continued the Methotrexate, and asked Plaintiff to follow up in a few months. (R. at 639.) At a follow up visit in July 2011, Plaintiff reported no improvement in pain. (R. at 635.) Dr. Han continued the Methotrexate, but also added Humira. (R. at 636.)

In August 2011, Plaintiff was seen at the Lourdes Medical Center Emergency Departments for a psychiatric evaluation after an altercation with her son. (R. at 804-06.) She was assessed

to have no tenderness in her extremities, and diagnosed with a
depressive reaction.  (R. at 805–07.)  She was given psychiatric
drugs at the ER and assessed to have clear speech and respond
appropriately to questions.  (Id.)  She returned to Dr. Alcera
four days later reporting pain and depression.  (R. at 681–82.)
Dr. Alcera noted a spasm in her lower back, but otherwise
Plaintiff's extremities were normal.  (R. at 683–84.)  Plaintiff
also had a normal attention span and concentration and did not
present as intending to cause herself harm.  (Id.)  Dr. Alcera
noted that disability paperwork need to be completed, and that
"due to all patient['s] problem[s], she still feels that she
cannot go back to work."  (R. at 681–82.)

On September 24, 2011, Plaintiff went to the ER at Virtua
Hospital reporting diarrhea.  (R. at 604.)  There was no
tenderness noted in her back and her extremities were normal
with no tenderness.  (R. at 605–06.)  She was given antiemitics
and diagnosed with gastroenteritis.  (Id.)  Plaintiff followed
up with Dr. Alcera three days later complaining of abdominal
pain, depression, and rheumatoid arthritis.  (R. at 685.)  Dr.
Alcera did not observe any joint pain or swelling and found a
normal range of motion and muscle strength.  (R. at 687.)
Plaintiff returned to the Virtua Hospital ER on October 6, 2011
reporting diarrhea and having passed out.  (R. at 583–84.)  She
had no swelling in her extremities, and she was diagnosed with

8

diarrhea.  (R. at 585.)  Plaintiff again went to the Virtua
Hospital ER on October 10, 2011 reporting diarrhea as well as
abdominal pain.  (R. at 564.)  Again, no tenderness was noted in
her back, and her extremities were normal with no tenderness or
swelling, and at discharge she ambulated without assistance.
(R. at 565-67.)

On October 13, 2011, Plaintiff saw Pamela Traisak, M.D., a
rheumatologist at Cooper University Hospital, who took over her
treatment from Dr. Han.  (R. at 632.)  She had discontinued
using Methotrexate, and had fallen behind on using Humira due to
stomach problems.  (Id.)  There was some swelling in her hands
and feet, but her gait was normal.  (Id.)  Dr. Traisak wanted to
wait until the stomach problems had resolved before continuing
Humira, but prescribed nothing additional.  (R. at 634.)
Plaintiff saw Dr. Alcera at the end of October and reported
anxiety and stress as well as some joint pain.  (R. at 689-90.)
She then saw Dr. Ganti twice in December 2011 to discuss anxiety
and back pain as well as paper work.  (R. at 691-94.)  Plaintiff
followed up with Dr. Ganti on January 5, 2012 for her back pain,
and Dr. Ganti found her stable on generic Vicodin.  (R. at 695.)

Beginning in December 2011, Plaintiff began seeing Dana
Spitz, MSW, LSW, a mental health therapist with the Community
Counseling Center once a week.  (R. at 740.)  She came to
discuss family issues including her son's behavior and her

mother's health, and also her own health issues.  (Id.)  With progress, Plaintiff's sessions were eventually reduced to every other week some time by May 25, 2012.  (Id.)

Plaintiff followed up with Dr. Traisak on January 26, 2012. (R. at 672.)  She reported stress at home, but improvement with her gastrointestinal symptoms and resumption of Humira.  (Id.) On examination, Dr. Traisak noted puffiness in wrists and knees, as well as mild tenderness in the knees and small joints of the hands.  (R. at 673.)  Dr. Traisak recommended continuing Humira and noted that Plaintiff reported that Humira "makes a difference with decreasing her joint symptoms."  (Id.)

On April 5, 2012, Dr. Traisak completed a disability questionnaire from Plaintiff's counsel.  (R. at 700.)  She opined that Plaintiff was stable on treatment with Humira, and that Plaintiff had swelling in her wrists and knees, tenderness in the small joints of her hands, and multiple trigger points. (R. at 700-01.)  However, she did not indicate abnormal gait or posture or any reduced range of motion, other joint problems, or muscle spasm, atrophy, or weakness.  (R. at 701.)  Dr. Traisak described Plaintiff's pain as widespread and chronic, but concentrated in the hands and back.  (R. at 702.)  She opined that Plaintiff could sit for four hours in an eight-hour work day and stand/walk for four hours, and would need to get up and move every hour for fifteen minutes.  (R. at 703.)  Dr. Traisak

further opined that that Plaintiff would miss work 2-3 times a month due to symptoms and that her symptoms would frequently interfere with her attention and concentration, but that she was capable of low stress work considering her age and medication. (R. at 704-05.)  Two weeks after issuing her opinion on Plaintiff's disability, Dr. Traisak saw Plaintiff on April 19, 2012.  (R. at 818, 842.)  Plaintiff stated that "she has noticed a big difference in terms of general joint symptoms with [Humira] as opposed to not being on it" and overall felt that she was doing better.  (Id.)  As a result, Dr. Traisak continued her on Humira.  (R. at 820, 842-44.)

    Another state agency physician, David X. Schneider, M.D., on April 11, 2012 reviewed the medical record and the opinion of Dr. Paolino from March 2011.  (R. at 707.)  He affirmed Dr. Paolino's RFC recommendation that Plaintiff could stand and/or walk for two hours and sit for about six hours in a normal eight-hour workday.  (Id.; see also R. at 538.)  Plaintiff went to see J. Theodore Brown, Ph.D., for another consultative mental status examination on May 1, 2012.  (R. at 716.)  She reported "pain and discomfort, constant worry, racing thoughts, anxiety and panic attacks of sorts."  (R. at 717.)  Dr. Brown assessed that Plaintiff had a normal gait and posture, and Plaintiff informed Dr. Brown that she managed her own money and enjoyed taking care of her baby.  (R. at 718.)  He also assessed that

she had a GAF score of 50-55.[3]  (R. at 719.)  Dr. Brown assessed that her prognosis was "very much contingent upon . . . continuing to receive and being able to benefit from mental health support and treatment," and cautioned that she should not manage her own funds.  (Id.)

Michael D'Adamo, Ph.D., a state agency physician, reviewed the record and on May 24, 2012 opined about Plaintiff's mental health conditions.  (R. at 722.)  Dr. D'Adamo opined that Plaintiff had moderate restriction of activities, mild difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (R. at 732, 736-37.)  He also opined that she is able to handle multi-step directions and that she can make suitable social adaptations on a job.  (R. at 738.)  The same day, Plaintiff's counselor from Community Counseling Center also opined that Plaintiff had no functional limitations based on her mental state.  (R. at 743-47.)

On August 16, 2012 Plaintiff followed up with Dr. Traisak and complained of increasing back symptoms again, but no joint tenderness or swelling was observed by Dr. Traisak.  (R. at 815-16.)  Dr. Traisak suggested that Plaintiff return to the YMCA as

---

[3] A GAF score of 50-55 breaks across two ranges.  The 51-60 range indicates moderate symptoms, as explained in note 2, supra.  The 41-50 range indicates serious symptoms.  (See Pl.'s Br. at 16 n.39.)

12

Plaintiff had reported that going had helped her pain.  (R. at 815–17.)  She also prescribed additional medication to Plaintiff for her fibromyalgia in addition to the Humira.  (R. at 817.)  On December 18, 2012, Plaintiff again saw Dr. Traisak.  (R. at 840.)  Plaintiff failed to take medication prescribed to her in August for fibromyalgia, but Dr. Traisak assessed her rheumatoid arthritis as clinically stable.  (R. at 840–41.)  Dr. Traisak also suggested Voltaren gel for hand pain.  (R. at 841.)

At Dr. Traisak's referral, Plaintiff underwent a nerve conduction study on January 3, 2013.  (R. at 863.)  The study was normal and showed no evidence of carpal tunnel, cervical radiculopathy, or large fiber neuropathy.  (Id.)  On Plaintiff's return to Dr. Traisak on April 18, 2013, Plaintiff reported that she had forgotten to take Humira for the past four months.  (R. at 809.)  Plaintiff also complained of swollen and painful hands, but indicated that she did not try the Voltaren gel.  (Id.)  Dr. Traisak told Plaintiff to resume taking Humira as she had been before, and prescribed no other treatment.  (R. at 811.)

In May 2013, Dr. Ganti completed an impairment questionnaire sent by Plaintiff's counsel.  (R. at 796.)[4]  Based

---

[4] There are two distinctly different handwritings on Dr. Ganti's opinion.  For example, in the question dealing with pain, the answers to the subparts dealing with nature and frequency of pain are in one handwriting, and the subparts dealing with the

on his examination of Plaintiff in December 2012, Dr. Ganti opined that Plaintiff could sit for one hour and stand for two hours in an eight-hour workday and would need to get up every ten to twenty minutes to move around.  (R. at 796-99.)  He indicated that Plaintiff would have marked difficulty in grasping, turning, and twisting objects, and that she would have moderate difficulty in fine manipulations and in using her arms for reaching.  (R. at 799-800.)  He concluded that she would be unable to tolerate even low stress work and that she was "barely functional."  (R. at 801-02.)

###   C.   Administrative Hearing and ALJ Decision

ALJ Cerulli held a hearing on August 14, 2013.  (R. at 68.) During the hearing Plaintiff testified that she drives short distances to medical appointments and to the store, driving up to forty miles on good days.  (R. at 76.)  She also related to the ALJ symptoms of her back pain and her hand issues from the rheumatoid arthritis.  (R. at 82-83, 95-99, .)  Plaintiff further described her past medical treatments, current drug regimen, and other techniques used to alleviate pain.  (R. at 84-89.)  Plaintiff also discussed her mental health issues with the ALJ and the treatment she was undergoing for anxiety and

---

location of and precipitating factors leading to pain are in another.  (See R. at 797-98.)

depression.  (R. at 89–94.)  Plaintiff further testified that she had not used a cane since the post-operative period from her 2010 surgery.  (R. at 94.)  She then testified about her daily activities, routines, and her hobbies, including reading, watching TV, and swimming.  (See R. at 99–103.)  Plaintiff's counsel solicited some additional testimony about pain symptoms.  (R. at 103–05.)  After hearing from Plaintiff, the ALJ then took testimony from a VE.  (See R. at 105–12.)

In a written decision dated January 10, 2014, the ALJ determined that Plaintiff was not disabled at any time through the date of decision using the five-step sequential analysis described in Section III.B, infra.  (R. at 48.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of December 9, 2009.  (R. at 49.)  At step two, the ALJ found that Plaintiff suffered from "the following severe impairments:  rheumatoid arthritis; degenerative disc disease of the lumbar spine, status post lumbar fusion; pain disorder; major depressive disorder; and panic disorder."  (R. at 49–51.)  However, at step three, the ALJ determined that Plaintiff's impairments did not meet, or equal in severity, any impairment found in the Listing of Impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 51–52.)

The ALJ then determined that Plaintiff possessed the residual functional capacity ("RFC") to:

> [P]erform less than the full range of sedentary work as that term is defined in 20 C.F.R. 404.1567(a) and 416.967(a). More specifically, [Plaintiff] can lift and/or carry up to 10 pounds occasionally, sit for up to six hours in an eight-hour workday, and stand and/or walk for up to two hours in an eight-hour workday. She can frequently push and pull with the upper and lower extremities, can perform frequent handling, fingering, and feeling, and can occasionally climb ramps and stairs. However, she can never climb ropes, ladders, or scaffolds and can only occasionally balance, stoop, kneel, crouch and crawl. [Plaintiff] should avoid concentrated exposure to extreme cold and heat; wetness and humidity; and hazards such as unprotected heights and moving machinery. In addition, [Plaintiff] retains the capacity to perform unskilled work involving routine and repetitive tasks, in a low stress environment, defined as involving only occasional changes in the work setting and occasional independent decision-making; and occasional interaction with coworkers, supervisors, and the public.

(R. at 52–53.) In reaching this conclusion, the ALJ considered the medical records submitted by the various treating physicians Plaintiff had seen. (R. at 53.) The ALJ noted that Plaintiff had lumbar spine impairment dating back to 2006, and surgeries in 2006 and 2010 to attempt to rectify the issues. (R. at 53– 54.) He remarked that by February 2011, during an examination by Dr. Kohna, Plaintiff needed no assistance in walking and was able to walk at a reasonable pace. (R. at 54.) He also noted that Dr. Kohna opined that Plaintiff could perform a "desk job." (Id.) The ALJ expressly gave Dr. Kohna's opinion "[s]ome weight" because of her "direct observation of [Plaintiff] in the

16

applicable specialty of physiatry," but because Dr. Kohna did
not elaborate on what a "desk job" was, the ALJ did not assign
any greater weight to her opinion.  (Id.)

With respect to Plaintiff's claims regarding hand and wrist
pain, the ALJ discussed her history of rheumatoid arthritis in
the medical record.  (Id.)  He cited to Dr. Traisak's reports in
January 2012 that Humira injections were reducing the severity
of Plaintiff's symptoms and that physical examinations showed
that her condition was clinically stable.  (Id.)  The ALJ relied
upon Dr. Traisak's opinion in April 2012 that Plaintiff "was
capable of sitting, standing, and walking for four hours out of
an eight-hour workday," but then gave the early assessment
little weight because it was not consistent with later record
evidence from April 2013 where Plaintiff had only mild
tenderness, no limitation of range of motion, and no
neurological deficits.  (R. at 54–55.)  The ALJ further
discounted the assessment of Dr. Ganti, finding it incompatible
with treatment notes that found Plaintiff's lumbar spine
condition well managed by pain medication.  (R. at 55.)

Turning to the potential psychiatric disability, the ALJ
reviewed Plaintiff's interactions with her mental health
physicians.  (R. at 55–56.)  Plaintiff had over time
demonstrated improvement in her mental state by undertaking
activities that required some level of sustained concentration

17

and reducing her counseling sessions, but still demonstrated moderate psychiatric symptoms. (R. at 56.) The ALJ discounted findings on both ends of the spectrum -- those that assessed Plaintiff as being too impaired to function, and those that assessed Plaintiff as having no limitations related to psychiatric impairments -- in concluding that the medical record supported a finding of psychiatric limitations, but not severe enough to preclude all work. (R. at 56-57.)

In evaluating Plaintiff's credibility, the ALJ found that while Plaintiff likely suffered impairments, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. at 57.) The ALJ cited conflicting testimony from Plaintiff about difficulty of using her hands, but her father's testimony about her communication with friends via text messages daily and her own self reporting of being self-sufficient in personal care and capacity to prepare meals, do housework, and care for her children. (Id.) He also compared her testimony with the record evidence showing improvement of her symptoms upon treatment in ultimately finding her testimony of disabling symptoms not fully credible. (R. at 57-58.) The ALJ further gave little weight to the opinion of the state agency medical consultants due to their inability to personally examine Plaintiff and for reaching conclusions inconsistent with the medical record. (R. at 58.)

The ALJ did give some weight to the opinion of the state agency psychological consultant who found that Plaintiff had some capacity for work, albeit with some limitations.  (Id.)

At step four, the ALJ concluded that Plaintiff was unable to perform her past relevant work as a mortgage loan processor and as a receptionist and admissions clerk in medical offices, as they are considered semi-skilled to skilled work with sedentary to light exertion in the Dictionary of Occupational Titles ("DOT").  (R. at 58-59.)  This was inconsistent with his determination of Plaintiff's RFC.  (R. at 59.)

Finally, at step five, the ALJ found that there were a significant number of jobs available in the national economy which Plaintiff could perform.  (R. at 59-60.)  The ALJ determined that Plaintiff's RFC meant she could not perform the full range of sedentary work, but based on the credited testimony of the VE, Plaintiff could still perform a number of unskilled sedentary occupations.  (R. at 60.)  The VE testified that Plaintiff could be an Information Clerk (D.O.T. 237.367-046 [SVP2; Sedentary]), a Call-out Operator (D.O.T. 237.367-014 [SVP2; Sedentary]), or a Surveillance System Monitor (D.O.T. 379.367-010 [SVP2; Sedentary]).  (Id.)  The ALJ credited this opinion, and noted that the VE reduced the number of available jobs by half in his testimony, acknowledging that some of these jobs are now performed as semi-skilled work, despite being

19

classified in the DOT as unskilled. (Id.)  As a result, the ALJ
determined that "[a] finding of 'not disabled' is therefore
appropriate under the framework of [SSR 85-15]." (Id.)

### D.  Parties' Arguments

Plaintiff presents three issues on appeal.  First, she
asserts that the ALJ failed to properly weigh the medical
evidence in determining her RFC.  (Pl.'s Br. [Docket Item 9] at
20.)  Specifically, Plaintiff argues that the ALJ improperly
afforded little weight to her treating physicians' opinions and
improperly failed to consider all of the relevant factors for
weighing treating source medical opinions.  (Id. at 21-27.)
Second, Plaintiff argues that the ALJ failed to properly
evaluate her credibility in determining her RFC.  (Id. at 27-
31.)  Finally, Plaintiff alleges that the ALJ relied on flawed
VE testimony at step five by posing an incomplete hypothetical
that failed to reflect all of her impairments.  (Id. at 31-33.)

Defendant responds that the determination of the ALJ was
supported by substantial evidence and that each of Plaintiff's
arguments fail.  (Def.'s Br. [Docket Item 10] at 14.)  In
responding to Plaintiff's first two arguments, Defendant submits
that the ALJ's evaluation of the treating physician opinions and
assessment of Plaintiff's credibility were supported by
substantial evidence in the record.  (Id. at 15-23.)  With

respect to the final argument, Defendant responds that the ALJ's determination of Plaintiff's RFC incorporated all credibly established limitations, and no further limitations needed to be posed to the VE.  (Id. at 23-25.)

## III. DISCUSSION

### A.  Standard of Review

This Court has jurisdiction to review the Commissioner's decision to deny disability benefits pursuant to 42 U.S.C. § 405(g).  The Court's review is deferential to the Commissioner's decision, and the Court must uphold the Commissioner's factual findings where they are supported by "substantial evidence."  42 U.S.C. § 405(g); Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Id. (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)).  "It is 'more than a mere scintilla but may be somewhat less than a preponderance of the evidence.'"  Id. (quoting Rutherford, 399 F.3d at 552); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). "Where the ALJ's findings of fact are supported by substantial evidence, [the Court] is bound by those findings, even if [the Court] would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)).  "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'"  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).  "The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects."  Id. (citing Stewart v. Sec'y of Health, Educ. & Welfare, 714 F.2d 287, 290 (3d Cir. 1983)).

### B.   Legal Standard for Determination of Disability

Under the Act, a "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual is disabled if her impairments are severe enough that not only is she incapable of performing her previous work, but she is also incapable of engaging in 'any other kind of substantial gainful work which exists in the national economy.'"  Zirnsak, 777 F.3d at 611 (quoting 42 U.S.C. § 423(d)(2)(A)).

The disability determination is made through a five-step sequential process.  Id. (citing 20 C.F.R. § 404.1520(a)).  The process is as follows:

> First, the Commissioner considers whether the claimant is "engaging in substantial gainful activity."  [20 C.F.R.] § 404.1520(a)(4)(i).  If yes, then the claimant is not disabled.  Id.
>
> Second, the Commissioner considers the severity of the claimant's impairment(s).  Id. § 404.1520(a)(4)(ii).  If the claimant's impairment(s) are either not sever or do not meet the duration requirement, the claimant is not disabled.  Id.
>
> Third, the Commissioner considers whether the claimant's impairment(s) meet or equal the requirements of one of the Commissioner's listed impairments.  Id. § 404.1520(a)(4)(iii).  If the claimant's impairment(s) meet the requirements of a listed impairment, then the claimant is disabled.  Id.
>
> If not, then the inquiry proceeds to the fourth step, where the Commissioner considers whether the claimant can return to her past work.  Id. § 404.1520(a)(4)(iv). To determine whether the claimant can perform her past work, the Commissioner assesses the claimant's residual functional capacity ("RFC").  Id. § 404.1520(e).  A claimant's RFC measures "the most [she] can do despite [her] limitations."  Id. § 404.1545(a)(1).  The Commissioner examines "all of the relevant medical and other evidence" to make its RFC determination.  Id. § 404.1545(a)(3).  If the Commissioner finds that the claimant can still perform her past work, she is not disabled.  Id. § 404.1520(a)(4)(iv). . . . [D]uring steps two through four of the inquiry, the claimant always bears the burden of establishing (1) that she is severely impaired, and (2) either that the severe impairment meets or equals a listed impairment, or that it prevents her from performing her past work.  Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983).
>
> If the claimant meets those burdens by a preponderance of the evidence, then the inquiry proceeds to step five,

where the Commissioner bears the burden of establishing
the existence of other available work that the claimant
is capable of performing.      20   C.F.R.
§ 404.1520(a)(4)(v); <u>Kangas v. Bowen</u>, 823 F.2d 775, 777
(3d Cir. 1987).   To meet this burden, the Commissioner
must produce evidence that establishes that "work exists
in significant numbers in the national economy that [the
claimant] can do."   20 C.F.R. § 404.1560.   The
Commissioner uses the RFC assessment, <u>id.</u> § 404.1520(e),
and the testimony of vocational experts and specialists,
<u>id.</u>   § 404.1566(e);   416.966(e),   to   make   this
determination. "Ultimately, entitlement to benefits is
dependent upon finding the claimant is incapable of
performing work in the national economy." <u>Provenzano v.
Comm'r of Soc. Sec.</u>, Civ. No. 10-4460 (JBS), 2011 WL
3859917, at *1 (D.N.J. Aug. 31, 2011).

<u>Zirnsak</u>, 777 F.3d at 611-12.

### C.   Determining Plaintiff's RFC

Plaintiff's first two arguments both deal with the manner

in which the ALJ arrived at Plaintiff's RFC.   Plaintiff

challenges the weight the ALJ gave to the opinions of her

treating physicians, Dr. Traisak and Dr. Ganti, as well as the

ALJ's determination of the credibility of the Plaintiff herself.

As explained below, the Court finds that both of these

challenges fail.

### 1.   Weighing Medical Evidence

The ALJ expressly gave little weight to any of the opinions

of Plaintiff's treating physicians.   (<u>See</u> R. at 54-58.)   For

each physician, he generally found that the physician overstated

Plaintiff's infirmity and that their opinions did not comport

with their clinical notes.   (<u>See</u> <u>id.</u>)   Plaintiff specifically

24

takes issue with the ALJ's failure to incorporate all the
limitations opined by Dr. Traisak and Dr. Ganti into the RFC.
(Pl.'s Br. at 22-26.)  For the reasons that follow, the Court
disagrees with Plaintiff.

"An ALJ should give 'treating physicians' reports great
weight, especially when their opinions reflect expert judgment
based on a continuing observation of the patient's condition
over a prolonged period of time.'"  <u>Brownawell v. Comm'r of Soc.</u>
<u>Sec.</u>, 554 F.3d 352, 355 (3d Cir. 2008) (quoting <u>Morales v.</u>
<u>Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000)).  "While contradictory
medical evidence is required for an ALJ to reject a treating
physician's opinion outright, such an opinion may be afforded
'more or less weight depending upon the extent to which
supporting explanations are provided.'"  <u>Id.</u> (quoting <u>Plummer</u>,
186 F.3d at 429).  "The law is clear, however, that the opinion
of a treating physician does not bind the ALJ on the issue of
functional capacity."  <u>Brown v. Astrue</u>, 649 F.3d 193, 196 n.2
(3d Cir. 2011) (citing <u>Adorno v. Shalala</u>, 40 F.3d 43, 47-48 (3d
Cir. 1994)).  "The ALJ -- not treating or examining physicians
or State agency consultants -- must make the ultimately
disability and RFC determinations."  <u>Chandler v. Comm'r of Soc.</u>
<u>Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011) (citations omitted).  As
the parties agree, (<u>see</u> Pl.'s Br. at 20; Def.'s Br. at 15),
controlling weight is given to a treating physician's opinion

25

when the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. §§ 404.1527(c)(2), 404.927(c)(2).

The ALJ afforded Dr. Traisak's opinion "little weight." (R. at 55.)  Dr. Traisak first saw Plaintiff on October 13, 2011, but also relied on Plaintiff's visits with another doctor in her practice dating back to March 29, 2011 in forming her opinion.  (R. at 700, 706.)  On April 5, 2012, Dr. Traisak opined that Plaintiff could sit for four hours and stand for four hours during an eight-hour workday and that Plaintiff could handle low stress work.  (R. at 703–05.)  She considered that Plaintiff was "on a good medication for arthritis and is young" as a basis for her opinion.  (R. at 705.)  This assessment comports with Dr. Traisak's assessment of Plaintiff in January 2012.  (See R. at 672–74.)  The ALJ relied on the fact that by April 2013, a year later, Plaintiff reported feeling better, even when she had stopped taking Humira for four months, in giving Dr. Traisak's opinion little weight.  (R. at 55, 809–11.)

Plaintiff relies in part on medical records from visits with Dr. Traisak later in 2013 in arguing that the ALJ improperly gave less weight to Dr. Traisak's opinion.  (See

Pl.'s Br. at 23-24.)[5]   However, the hearing record before the ALJ did not contain medical records of Plaintiff's visits with Dr. Traisak beyond April 2013.  (See R. at 47 (noting that the record of exhibits before the ALJ ends at Exhibit 35F).)  It appears that the records for Plaintiff's visits with Dr. Traisak in July and November 2013 in Exhibit 36F were submitted to the Social Security Administration on or about April 23, 2014, which was after the ALJ issued his decision on January 10, 2014.  (See R. at 869 (print date for the submission barcode reads "4/23/2014").)  These medical records are thus new evidence not submitted to the ALJ, but apparently submitted to the Appeals Council.

New and material evidence may be submitted to the Appeals Council, and the Appeals Council "shall evaluate the entire record including the new and material evidence submitted if it related to the period on or before the date of the administrate law judge hearing decision."  20 C.F.R. § 404.970(b).  "However, the submission of the new and material evidence does not require the Appeals Council to grant review."  Matthews v. Apfel, 239

---

[5] Plaintiff in this section of her brief cites to many medical findings showing that she had pain to show disagreement with the weight given to Dr. Traisak's and Dr. Ganti's opinions, (see Pl.'s Br. at 23-24), but many of the citations are to findings made prior to her 2010 surgery that marked a significant improvement in her condition, and have little to no bearing on the weight given to Dr. Traisak's and Dr. Ganti's opinions.

F.3d 589, 592 (3d Cir. 2001) (citing 20 C.F.R. § 404.970(b)).
If the Appeals Council does not grant review after new and
material evidence is submitted to it, then for a court to remand
the case to the Commissioner on the basis of the new and
material evidence, the claimant must additionally show good
cause for why the evidence was not presented to the ALJ in the
first instance.  Id. at 594; see also 42 U.S.C. § 405(g) ("The
court . . . may at any time order additional evidence to be
taken before the Commissioner of Social Security, but only upon
a showing that there is new evidence which is material and that
there is good cause for the failure to incorporate such evidence
into the record in a prior proceeding . . . .").

        Plaintiff has not made any showing of good cause for why
these records were not submitted to the ALJ.  The ALJ
specifically left the hearing record open at Plaintiff's request
to receive additional updated medical evidence.  (R. at 71.)
Plaintiff's counsel volunteered a short time limit for leaving
the record open until August 28, 2013, and then failed to submit
these records from July 2013.  (See id.)  While there may be an
argument for good cause for the records from November 2013,
Plaintiff has not put one forward, nor even acknowledged that
this issue exists, and the Court will not endeavor to find good
cause for Plaintiff.  As such, the Court will not order remand

based on the records in Exhibit 36F and will not consider Exhibit 36F in its assessment of the ALJ's determination.

With respect to Dr. Ganti's opinion, the ALJ similarly determined that "little weight is accorded to his medical opinion regarding the claimant's functional capacity." (R. at 55.) Dr. Ganti provided his opinion on June 17, 2013 and opined that Plaintiff could sit for one hour and stand for two hours during an eight-hour work day and was incapable of even low stress work based primarily on her lumbar spine problems, anxiety, depression, and autonomic nervous system disorders. (R. at 796–803.) He also concluded that Plaintiff was "barely functional." (R. at 803.) Dr. Ganti relied on his treatment of Plaintiff dating back to June 17, 2010 and his most recent examination of Plaintiff six months prior to his opinion in December 2012. (R. at 796.)[6] The ALJ relied on this six month gap between examination and opinion as well as notes indicating that Plaintiff's "lumbar condition was either asymptomatic or well managed by pain medication" and Dr. Ganti's failure to

_____

[6] Interestingly, the record reflects that Plaintiff was not treated by Dr. Ganti on June 17, 2010. Rather, she was treated by another physician at Virtua Family Physicians, Dr. Alcera. (See R. at 481.) Conversely, handwriting similar to that of Dr. Ganti's on his June 17, 2013 opinion appears in treatment notes from Virtua Family Physicians dating back to November 6, 2009. (See R. at 491.) Plaintiff was a patient of Virtua Family Physicians before that, having had her establishing visit on June 12, 2009. (See R. at 494.)

reference Plaintiff's rheumatoid arthritis in giving his opinion less weight. (R. at 55.)

In addition, in affording Dr. Traisak's and Dr. Ganti's opinions of Plaintiff's limitations lesser weight, the ALJ noted that their opinions conflicted with the opinion of Dr. Khona. (R. at 54.) Dr. Khona opined that Plaintiff "may be trainable for a desk job with no lifting more than 25 pounds." (R. at 533.) The ALJ gave this opinion "[s]ome weight," but ultimately found the opinion of having "the capacity for 'desk' work without elaboration" vague. (R. at 54.) However, Dr. Khona's examination of Plaintiff occurred in February 2011 -- over a year before Dr. Traisak offered her opinion, and over two years before Dr. Ganti offered his opinion. (R. at 531.) Further, Dr. Khona's opinion expressly did not consider any medical records. (Id.)

The Court finds no reversible error in the ALJ's treatment of Dr. Traisak's opinion. While the Court agrees that "a doctor's observation that a patient is stable and well controlled with medication during treatment does not necessarily support the medical conclusion that the patient can return to work," Brownawell, 554 F.3d at 356 (internal quotations and alterations omitted), the Third Circuit also noted that if the opinion of the treating physician is not well supported in treatment notes, the opinion may be afforded less weight, id. at

30

355.   The ALJ did not wholly discount Dr. Traisak's opinion, and substantial evidence supports the decision to give her opinion less weight in light of Plaintiff's improvements even when medication was discontinued for a four-month period.

The Court similarly finds no reversible error in the ALJ's treatment of Dr. Ganti's opinion.  Substantial evidence supports the ALJ's decision to accord little weight to Dr. Ganti's opinion, namely the length of time from Dr. Ganti's last examination of Plaintiff to the time of his opinion and the lack of treatment notes for visits Plaintiff had with Dr. Ganti or anyone from Virtua Family Associates after February 2012. Further, Dr. Ganti's opinion is severely at odds with the opinion of Dr. Traisak and the state agency consultant, Dr. Khona.

Accordingly, Plaintiff's challenge to the weight the ALJ gave the opinions of her treating physicians fails.

### 2.   Assessing Plaintiff's Credibility

Plaintiff also challenges the ALJ's decision finding that her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." (R. at 57.)  She asserts that the ALJ failed to properly

consider the factors of SSR 96-7p[7] when making a credibility analysis regarding Plaintiff's statements.  (Pl.'s Br. at 28-31.)  Defendant argues that the ALJ's determination is supported by substantial evidence and should be accorded great deference.  (Def.'s Br. at 19-22.)  As explained below, the Court agrees with the Defendant.

The ALJ is required to "determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it."  Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).  The ALJ in assessing the credibility of complaints about symptoms of pain and discomfort must "consider [the claimant's] statements about the intensity, persistence, and limiting effects of [a claimant's] symptoms, and . . . evaluate [a claimant's] statements in relation to the objective medical evidence and other evidence."  20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  In addition to objective medical evidence, the ALJ should also consider (1) plaintiff's daily activities; (2) the location, duration, frequency, and

---

[7] Effective March 16, 2016, SSR 96-7p was superseded by SSR 16-3p.  See Social Security Ruling 16-3p; Titles II and XVI: Evaluations of Symptoms in Disability Claims, 81 Fed. Reg. 14166, 14167 (Mar. 16, 2016).  As SSR 16-3p explains, the point of the new ruling from the Social Security Agency was to remove the word "credibility" from the analysis to make clear that there is no examination of a witness's character, and to hew closer to the regulatory language contained within the relevant C.F.R. provisions.  Id.  Accordingly, the Court's analysis is the same under either ruling.

intensity of symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate symptoms; (5) treatment, other than medication, received for the symptoms; (6) any alternative measures the plaintiff has used to alleviate the symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to symptoms.  20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3).  The Court must defer to the ALJ's assessment of credibility, but "the ALJ must specifically identify and explain what evidence he found not credible or why he found it not credible."  Zirnsak, 777 F.3d at 612.

The ALJ, relying on the medical record and statements from Plaintiff's father, found Plaintiff's claims of her own disability overstated.  The ALJ noted that after she had back surgery in September 2010 to address her lumbar spine problems, complaints at her follow up visits were "generally within normal limits" and that Humira was improving her arthritis symptoms. (R. at 57.)  The ALJ also remarked that the diagnostic record itself was complicated by Plaintiff's myriad complaints that went uncorroborated by testing results and physical examinations.  (R. at 57–58.)  Further, following her back surgery, the ALJ explained that plaintiff "presented at several physical examinations with no obvious clinical signs of

33

impairment at her lumbar spine.  In fact, treating sources
documented that she exhibited a normal gait, no muscle weakness,
no instability and no sensory or neurological deficits." (R. at
54.)  Plaintiff alleges that this final conclusion misstates the
record.  (Pl.'s Br. at 29-30.)  However, the two indications of
pain in the record pointed to by Plaintiff are not at odds with
the ALJ's characterization of the overall record.[8]  The first
instance, in April 2011, showed that Plaintiff did have some
back tenderness, but was otherwise ambulatory with a normal
gait.  (R. at 622-24.)  The second instance, in August 2011,
noted a spasm in Plaintiff's lower back, but that her
extremities were normal.  (R. at 683-84.)  These two notations
in light of the entire record would be "generally within normal
limits" as the ALJ concluded, (see R. at 57), and confirm that
the record provides substantial evidence in support of the ALJ's
assessment.

    Plaintiff also takes issue with the ALJ relying on her
ability "to engage in some sporadic activities of daily living"
in finding her not credible.  (Pl.'s Br. at 30.)  "[S]poradic
and transitory activities cannot be used to show an ability to
engage in substantial gainful activity."  Fargnoli v. Massanari,

---

[8] Plaintiff points to four instances in the record of continued
back pain, but two of those come from Exhibit 36F which the
Court has already refused to consider as discussed in Section
III.C.1, supra.

247 F.3d 34, 40 n.5 (3d Cir. 2001).  The ALJ relied on
Plaintiff's ability to text message daily despite claims of
difficulty using her hands due to rheumatoid arthritis symptoms
and her ability to "prepare meals, perform some light housework,
care for her infant child with assistance from other family
members, attend medical appointments, shop several times per
week, drive and travel independently . . . [and] manage money
and read."  (R. at 57.)  The Third Circuit, in a non-
precedential case, has explained that the court "disagree[s]
that housework and child care . . . constitute 'sporadic and
transitory activities.'"  Horodenski v. Comm'r of Soc. Sec., 215
F. App'x 183, 189 n.5 (3d Cir. 2007).  Further, the relevant CFR
provision requires the ALJ to consider Plaintiff's daily
activities in evaluating her credibility.  Accordingly, the
Court finds no error in the ALJ's consideration of Plaintiff's
daily activities in this manner.

    Plaintiff's remaining contentions merely reframe her
challenge to the weight the ALJ gave to the medical opinions of
her treating physicians, which this Court has already rejected.
Thus, the Court finds no reversible error in the manner in which
the ALJ determined the Plaintiff's RFC.

**D.   Hypothetical Posed to the VE**

Plaintiff's final challenge is to the hypothetical posed to the VE.  First, Plaintiff proposes that the hypothetical posed to the VE needs to incorporate all functional limitations opined on by her physicians that the ALJ did not incorporate into the RFC.  (Pl.'s Br. at 31-32.)  On this point, Plaintiff is incorrect.  "[A] hypothetical posed to a vocational expert must reflect <u>all</u> of a claimant's impairments." <u>Burns v. Barnhart</u>, 312 F.3d 113, 123 (3d Cir. 2002) (quoting <u>Chrupcala v. Heckler</u>, 829 F.2d 1269, 1276 (3d Cir. 1987) (emphasis added by source)).  But this "do[es] not require an ALJ to submit to the vocational expert every impairment <u>alleged</u> by a claimant." <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 554 (3d Cir. 2005).  Rather, in posing a hypothetical to the VE, "references to <u>all</u> impairments encompass only those that are medically established.  And that in turn means that the ALJ must accurately convey to the vocational expert all of a claimant's <u>credibly established limitations</u>." <u>Id.</u> (citations omitted).  As the Third Circuit noted in <u>Rutherford</u>, "objections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself." <u>Id.</u> at 554 n.8.[9]

---

[9] Plaintiff cites to <u>Rutherford</u> for the proposition that the ALJ needed to incorporate all of the limitations proposed by Dr. Traisak and Dr. Ganti.  (<u>See</u> Pl.'s Br. at 32.)  This is incorrect and misreads the case.

Accordingly, if the ALJ did not incorporate the limitation into the RFC, then the ALJ did not need to incorporate the limitation into the hypothetical posed to the VE.

Second, Plaintiff challenges the manner in which the ALJ characterized Plaintiff's mental and social limitations. (Pl.'s Br. at 32-33.) The ALJ had concluded that "the claimant has moderate difficulties" with respect to both concentration, persistence, or pace and social functioning. (R. at 51-52.) Incorporating this into the RFC, the ALJ specified that "the claimant retains the capacity to perform unskilled work involving routine and repetitive tasks, in a low stress environment, defined as involving only occasional changes in the work setting and occasional independent decision-making; and occasional interaction with coworkers, supervisors, and the public." (R. at 53.) This was the same hypothetical posed to the VE. (R. at 107-08.)

Plaintiff relies on the holding of Ramirez v. Barnhart, 372 F.3d 546 (3d Cir. 2004), for her position with respect to concentration, persistence, or pace. (Pl.'s Br. at 32-33.) In Ramirez, the Third Circuit held that a limitation of "no more than simple one or two-step tasks" was insufficient to encompass a finding by the ALJ that the claimant "often" had deficiencies in concentration, persistence, or pace. 372 F.3d at 554. However, a later panel of the Third Circuit in a non-

37

precedential opinion approved of the precise language used by the ALJ here, namely including a limitation in the RFC to "simple, routine tasks" in light of a claimant's moderate difficulties with concentration, persistence, or pace. McDonald v. Astrue, 293 F. App'x 941, 946 (3d Cir. 2008). The panel in McDonald expressly distinguished its holding from the holding in Ramirez on the grounds that often having difficulties with concentration, persistence, or pace is different from having moderate difficulty. Id. at 946 n.10.[10] Other courts of this district have also reflected this reasoning. See, e.g., Beattie v. Colvin, Civ. No. 15-235 (WJM), 2016 WL 347313, at *4 (D.N.J. Jan. 28, 2016), appeal docketed sub nom. Beatti v. Comm'r Soc. Sec., No. 16-1686 (3d Cir. filed Mar. 23, 2016); Winters v. Comm'r of Soc. Sec., Civ. No. 15-1357 (KM) 2015 WL 8489958, at *10 (D.N.J. Dec. 9, 2015); Padilla v. Astrue, Civ. No. 10-4968 (ES), 2011 WL 6303248, at *10 (D.N.J. Dec. 15, 2011). This Court sees no reason to disagree with that reasoning, and

---

[10] This holding has been called into doubt by some district court judges because between the decisions in Ramirez and McDonald, the five-point scale severity scale changed terminology from "never, seldom, often, frequent, constant" to "none, mild, moderate, marked, and severe," and the court in McDonald never addressed that change which would seem to equate "moderate" and "often." See Jury v. Colvin, No. 12-cv-2002, 2014 WL 1028439, at *11 n.21 (M.D. Pa. Mar. 14, 2014) (collecting cases). This challenge notwithstanding, this Court does not believe that the language here fails to encompass Plaintiff's credibly proven limitation.

therefore finds no error with the ALJ's incorporation of the mental limitations.

With respect to the social limitation, Plaintiff points to no case in support of her position.  The Defendant directs this Court to Rosa v. Commissioner of Social Security, Civ. No. 12-5176 (JLL), 2013 WL 5322711 (D.N.J. Sept. 20, 2013).  In Rosa, the court held that "[l]imiting Plaintiff to occasional contact with the public sufficiently encompassed his moderate difficulties in maintaining social functioning."  2013 WL 5322711, at *10.  The Court agrees with the decision of the court in Rosa and finds no reversible error in the manner with which the ALJ incorporated the social limitation into the hypothetical.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence in the record as a whole.  As a result, the ALJ's decision will be affirmed.  The accompanying Order will be entered.


May 9, 2016                                s/ Jerome B. Simandle
Date                                       JEROME B. SIMANDLE
                                           Chief U.S. District Judge